[Civ. No: 15347.   Second Dist., Div. Two.   Dec. 13, 1946.]

WILLIAM J. B. HUGHES, Respondent, v. CITY OF TORRANCE et al., Appellants.

John E. McCall and Burke, Hickson, Burke & Marshall for Appellants.

Entenza & Gramer for Respondent.

MOORE, P. J.—The question posed by this appeal is whether a contract made by the city of Torrance for the sale of all of its rolling stock and equipment used in the operation of a bus line is (1) void for the want of an authorization of two-thirds of the voters voting at a special election called to authorize the sale of such property, and (2) by reason (a) of the failure of the city council to determine that the public interest and necessity demands the sale of such property and (b) of its failure to submit the contract of sale to the voters of the city.

Since 1941 appellant city has operated a bus transportation service within and from its corporate limits. For the conduct of such operations it acquired busses and other vehicles and the necessary shops, garages and mechanical parts for the maintenance of such vehicles, maintained bus depots within its corporate limits and within the city of Los Angeles and employed sufficient manpower for the conduct of its enterprise. On July 24, 1945, by vote of three to two, the city council authorized the execution of a contract with one Koors for the sale of "all of the properties of seller now used or useful in the conduct of that certain transportation passenger service conducted by the city of Torrance as the Torrance Municipal Bus Line . . . for a bid price of Sixty five thousand ($65,000) . . . to be paid in cash for said properties in accordance with the provisions of law and the terms and conditions hereinafter set out . . . that said total bid price . . . represents the aggregate of the purchase price . . . the reasonable value thereof of the several items hereby offered to be sold. . . " Koors paid $5,000 outside of escrow and it was provided that $60,000 be paid to the seller upon the presentation to the escrow holder of "a certified copy of a decision issued by the California Railroad Commission . . . granting to the buyer or his assignee a certificate of public convenience and necessity authorizing said buyer or his assignee to operate a transportation business as a passenger stage corporation as defined in Section 2¼ of the Public Utilities Act . . . authorizing the transportation over and along the public highways in the city of Torrance and vicinity . . . which said certificate . . . will authorize the buyer or buyer's assignee to conduct the same or a service similar to said service now being conducted by the Torrance Municipal Bus Line . . . Seller agrees to refrain from carrying on a similar business within the city of Torrance . . . as long as

the buyer conducts a passenger stage service in said area . . .
In the event . . . the seller elects to establish a like or similar
business . . . seller will purchase said transportation business
from the buyer or his assignee at the reasonable price thereof
and in accordance with law.''

After the dissenting members of the council had on July
24, 1945, attempted to effect a reconsideration of the action
taken in authorizing the execution of the contract, they de-
manded that the council submit the matter of a sale of the
transportation system to a vote of the electors of the city.
Inasmuch as the statute requires a two-thirds vote of the
council either to adopt a resolution to make sale of a public
utility or to submit the matter to a vote of the city's electorate,
the dissenters failed to effect the latter action by the same
vote as that which had authorized the contract. Thereupon
respondent as a taxpayer and elector instituted this action
''on behalf of himself and the citizens of Torrance to compel
appellants to proceed in accordance with law in the disposal
of a public utility . . . and to take no further steps to effect
a sale of said passenger transportation system, or the busses
and equipment thereof, until they first determine that public
necessity and interest demand such sale, and then submit to
the qualified voters of Torrance the proposition of selling said
transportation system and busses and equipment, in the man-
ner provided in said Sale of Public Utilities Act, 5203, Deer-
ing's General Laws, pages 1760-61, sections 1, 2, 3, 4 and 5;
or to show cause why they should not do so.''

An alternative writ of mandate having been issued upon
the petition of respondent the matter came on for trial on
October 29, 1945, before the order to show cause and receiv-
ership department, at which time it was stipulated that the
facts alleged in the amended petition were true with the ex-
ception of the charge of fraud which was waived by respon-
dent. After the introduction of the minutes of certain meet-
ings of the council the matter was submitted for decision. On
November 14, judgment awarding a peremptory writ was en-
tered against appellant city and its councilmen ''compelling
them to proceed only in accordance with law in the disposal
of the transportation system, and the bussses and equipment
thereof belonging to the city of Torrance, to wit, in accordance
with Act 5203, (Stats. 1921, p. 829) Volume 2, page 1760
Deering's General Laws, and to take no further steps under

the contract of July 24, 1945, between Charles F. Koors and the City of Torrance until after there has been passed a resolution of two thirds of the legislative branch of the municipal corporation, determining that the public interest and necessity demands that such sale be made, and then after the proposition of selling such public utility has been submitted to the qualified voters of the municipal corporation at an election held for that purpose, in the manner and under the condition set forth in said law, and thereafter only if said Koors is the highest and best bidder therefor.''

On November 28, appellants filed their return to the peremptory writ alleging therein that they had taken no further action in connection with the contract with Koors, and at the same time filed their notice of intention to move for a new trial. The motion for a new trial having been denied on December 28, 1945, the matter was transferred to this court by appeal.

Contrary to the contention of appellants the contract was an attempt by a municipality of the sixth class to sell a public utility. By statute municipal corporations are authorized to ''acquire, construct, own, operate or lease any public utility. A public utility as the term is used herein, is defined to mean the supply of a municipal corporation alone or together with the inhabitants thereof or any portion thereof, water, light, heat, power, transportation of persons or property, means of communication or promoting the convenience of the public.'' (Deering's Gen. Laws, Act 5202, p. 1759; Stats. 1911, p. 1394.) Thereafter an act was adopted whereby a municipal corporation may sell and dispose of any public utility owned by such municipal corporation. Section 2 thereof provides that in order to accomplish such a sale the legislative branch of the city ''shall by resolution passed by two-thirds of all its members determine that the public interest and necessity demands that any public utility owned by such city, town or municipal corporation should be sold, it may at any subsequent meeting of such legislative branch by a vote of two-thirds of all its members order the submission of the proposition of selling such public utility to the qualified voters of said city . . . at an election held for that purpose. The ordinance calling for such special election shall recite the object for which the election is to be held and the purpose for which the proceeds of such sale is proposed to be expended, the manner of holding such election and of voting for or against the

sale of such public utility . . ." (Act 5203, Sale and Disposal of Public Utilities; Stats. 1921, 829.)

Appellants contend that the city's contract with Koors "deals with all the properties now used or useful in the conduct of that certain passenger transportation service conducted by the city of Torrance and does not therefore constitute the sale of a public utility." Such contention apparently is based upon a technical reading of the document which purports to accomplish a sale of only the "physical equipment used in the transportation system." Appellants appear to bolster such contention on another clause of the contract which requires the city to repurchase the rolling stock and equipment of Koors or his assignee in the event the city should at some future time establish a service competitive to the transportation utility then serving the same area.

The suggestion that a public utility was not sold by the contract is not a reasonable construction of the writing. If all of the assets used by the municipality are to be transferred to the purchaser who in turn is to operate a public transportation system within and from the city there will be nothing left to constitute the public utility now known as the Torrance Municipal Bus Line. Of course if the contract had provided for the sale of a negligible number of busses or other equipment it could not be reasonably contended that the sale of a public utility had resulted. But it can hardly be denied that where a city has alienated so much of its equipment used in operating a public transportation business as to destroy its efficacy as such system it then no longer possesses such public utility. Therefore whether Act 5203 defines a public utility in so many words by applying the reason that is exercised in the ordinary affairs of life the conclusion cannot be obviated that a public utility has been sold if at the time of alienating its entire equipment and implements used in operating its utility it agrees to desist from maintaining a similar utility. Merely because the city had no certificate of convenience and necessity to transfer, a sale of its equipment and rolling stock *in toto* was not rendered thereby any the less a sale of a public utility. A municipality is the only entity exempt from the requirement to obtain such certificate. In making the purchase Koors knew that he was obtaining every item of property used by the Torrance bus line and that he would be required to comply with all laws regulatory of the operation of a public transportation system.

■ In answer to appellants' argument that there is neither statutory nor constitutional provision forbidding a city to cease furnishing a public transportation service it may be said that the very fact that the Legislature provided a method whereby the city might dispose of its utilities is a positive inhibition against such alienation except by a faithful compliance by the city with the statutory provision relating to sales of public utilities. (*People* v. *California Fish Co.*, 166 Cal. 576, 607 [138 P. 79] ; 37 Am.Jur. 691; *City National Bank* v. *Kiowa*, 104 Okla. 161 [230 P. 894, 39 A.L.R. 206, 211, 218].) ■ By the contract herein the city agrees that in the event it should at a future date again establish a public transportation system, despite its obligation to refrain from so doing, it will repurchase the equipment then owned by Koors or his assigns. Appellants contend that by virtue of such covenant "the city merely withdraws temporarily from the transportation business reserving the right to reengage in said business at any time it desires." Such a construction is irrational. The reasonable interpretation of the contract is that the city completely removes itself from the field of transportation utilities and depends on Koors or his successor to satisfy the needs of the Torrance public in the matter of bus transportation. A construction that the contract means that the city is "to lease to a private person the physical equipment used by it in the operation of a municipally owned transportation system" is in utter defiance of the language employed by the contracting parties to evidence their mutual intention.

The following conspicuous terms necessarily reveal the character of the document as one of purchase and sale: (1) "seller hereby offers to sell and buyer hereby offers to buy"; (2) "seller represents . . . service is operated by seller . . ."; (3) "seller . . . and buyer shall join in opening an escrow . . ."; "buyer agrees to deposit"; "$60,000 is to be paid to seller"; "granting to buyer a certificate of public convenience and necessity"; "seller shall execute a bill of sale . . . to vest title to said property in the buyer unincumbered and free . . ."; (4) "seller shall be entitled to all revenues to the date buyer takes possession"; "buyer shall take title"; (6) ". . . in connection with the sale of the properties . . . the seller represents . . . as long as the buyer conducts a passenger stage service . . . and in consideration for the sale and transfer . . . seller will purchase said transportation business from the buyer . . . at the reasonable price thereof"; (7) "buyer

agrees . . . to set aside a sum''; (8) during the period from the date ''that buyer takes title . . . seller agrees to protect and preserve all of said automotive equipment . . .'' The semanticist is hard pressed to ascertain that such words and phrases have any significance other than a definite purpose on the part of Torrance to sell and convey its entire equipment used in operating its public utility.

■ Appellants contend there is no constitutional requirement that a city in selling a public utility must do so in accordance with the Public Utilities Act. Such contention is founded upon a misconception of the nature of the state's Constitution. The city received its power to operate a public utility from Act 5202, Deering's General Laws, Statutes 1911, page 1394. The silence of the constitutional provision (section 19, art. XI)* as to the manner of conducting such a sale is wholly immaterial. The power of a municipality to own and operate a public utility was provided by an act of the Legislature approved May 1, 1911, whereas the constitutional amendment authorizing cities to operate public utilities was not adopted until October 10, 1911. The power of the Legislature to regulate cities and towns is a power inherent in a sovereign state and is within the sphere of proper legislative activities unless clearly inhibited by the Constitution. It follows that the absence from the Constitution of any provision for a method whereby a public utility must be sold is utterly immaterial. The so-called grant of power by section 19 of article XI was an exotic plant that sprouted in the congenial atmosphere prevalent in a year of many reforms. It was effectually an assumption by its framers that the legislative branch of the state derives its powers from express grants. Such a philosophy is incongruous with the theory of the foundation of the state under the American juridical system. There was no lack of power inherent in the Legislature in April, 1911, to create the Public Utilities Sales Act incorporated in Act 5202.

■ The assertion that a city operating a public transportation system might sell one or more busses is not to be gainsaid; but contrary to appellants' contention it is not true that the

---

*In part the section reads: ''Any municipal corporation may establish and operate public works for supplying its inhabitants with light, water, power, heat, transportation, telephone service or other means of communication. Such works may be acquired by original construction or by the purchase of existing works, including their franchises, or both.''

conversion of all of its rolling stock into trucks or any other chattels would not be forbidden. A city cannot do indirectly that which it is forbidden to do directly. Therefore an attempt to dispose of a public transportation system by selling one bus at a time or by exchanging all of its busses for other property would be disposing of its utility and would be subject to the provisions of section 2 of Act 5203 after municipal authorities had built it up by slow process. The public is invested with complete ownership thereof when built up by slow degrees to the same extent as though the utility had been purchased outright.

By reason of the provision in the contract that busses and other chattels to be sold to Koors were to be sold at ceiling prices as fixed by the Office of Price Administration, appellants contend that their sale is to be governed by the Emergency Price Control Act, 50 U.S.C.A. Appendix, section 901. It may be conceded that if the city had effected a sale of any used equipment by the Koors contract or any contract under date of July, 1945, the ceiling prices of such articles would have been fixed by the Office of Price Administration. There is no conflict between the Emergency Price Control Act and the Public Utilities Sales Act. The one was federal legislation designed to preserve the national economy; the other is a domestic statute created for the purpose of preserving the general welfare against corrupt or ill-advised disposal of public utilities by the officials of a municipality by requiring the approval of its electorate. It would be calamitous if a statute of such wholesome and far-reaching consequences could be obviated by the mere squidlike performance of shouting the language of any one of the countless federal statutes which when properly applied helps to maintain a tranquil society. The Emergency Price Control Act has no application to the issues concerning the sale of a public utility.

Appellants demand a reversal by reason of the failure of the court to make a finding that respondent was a taxpayer and elector of Torrance. Of course the issue as to the plaintiff's status in such an action ordinarily deserves a finding. However, in the instant action such a finding is implied in the judgment. The claim of respondent that it was stipulated in open court that the allegation that respondent is a taxpayer and voter of Torrance is disputed by appellants. The statements in the briefs are in conflict and there is no reporter's transcript. Many words both written and oral were bandied

by counsel concerning the matter but all to no avail. The procedure in such situations is clearly established. ▊ When an appeal is taken on the judgment roll alone the appellant is in no position to dispute the fact that competent proof was admitted to prove the facts found. Where the judgment roll does not contain written findings the court's determination of the facts supporting the judgment is implied in the judgment. ▊ In any event, when the record consists solely of the clerk's transcript no reversal can be ordered in the absence of a fatal error appearing in the judgment roll. The findings, actual or implied, are conclusively presumed to have been supported by the evidence and the proceedings before the trial court are presumed to have been regular. (*Gin S. Chow* v. *City of Santa Barabara,* 217 Cal. 673, 680 [22 P.2d 5] ; *Estate of Mautner,* 38 Cal.App.2d 521, 522 [101 P.2d 520].)

▊ In the absence of written findings it is presumed that the trial judge performed his official duty (Code Civ. Proc., § 1963, subd. 15) and obtained oral consent of appellants to a waiver of such findings (Code Civ. Proc., § 632). Where findings are waived it is presumed that every fact necessary to support the judgment was proved and found (*Gray* v. *Gray,* 185 Cal. 598 [197 P. 945] ; *Bekins Van Lines, Inc.* v. *Johnson,* 21 Cal.2d 135, 137 [130 P.2d 421]). In the instant cause it must be assumed that the proof showed and the court determined that respondent was at the time of filing and prosecuting his action a taxpayer and an elector of Torrance. (*Bekins Van Lines Inc.* v. *Johnson, supra.*)

The judgment is affirmed.

McComb, J., and Wilson, J., concurred.

A petition for a rehearing was denied December 31, 1946, and appellants' petition for a hearing by the Supreme Court was denied February 10, 1947.